**NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.**

In the Supreme Court of Georgia

Decided: March 3, 2026

S25A1498. JACKSON v. THE STATE.

ELLINGTON, Justice.

A DeKalb County jury found Quintavius Jackson guilty of felony murder and other crimes in connection with the shooting death of Sulaiman Jalloh.[1]  Jackson contends that the evidence was

---

[1] The crimes occurred on October 15, 2019. A DeKalb County grand jury returned an indictment on January 23, 2020, charging Jackson and his co-defendant, Cordarius Dorsey, with malice murder (Count 1), felony murder predicated on armed robbery and aggravated assault, respectively (Counts 2 and 3), armed robbery (Count 5), aggravated assault (Count 6), and possession of a firearm during the commission of a felony (Count 8). (Dorsey was separately indicted both for felony murder predicated on possession of a firearm by a convicted felon and for the underlying firearm offense (Counts 4 and 7). During a trial that began on December 5, 2022, the jury found Jackson not guilty of malice murder but guilty on the remaining counts. (The jury found Dorsey guilty on all counts.)  The judge imposed concurrent life sentences without the possibility of parole on both of Jackson's felony murder convictions (Counts 2 and 3) and a consecutive five-year prison term for possession of a firearm during the commission of a felony (Count 8). The court merged the armed robbery and aggravated assault counts into their respective felony murder counts. As explained more fully in Division 3 (b), infra, we must vacate Jackson's sentence and remand the case for resentencing because the trial court erred in sentencing Jackson on both felony murder counts. Jackson filed a timely motion for new trial on December 16, 2022, and he amended it on September 13, 2024. Following a hearing held on March 3, 2025, the trial court

constitutionally insufficient, that the jury's verdict is contrary to the principles of justice and equity and is decidedly and strongly against the weight of the evidence, that the trial court made evidentiary and sentencing errors, and that his trial counsel was constitutionally ineffective. As explained more fully below, Jackson has not carried his burden of showing reversible error. However, as explained in Division 3 (b), we vacate Jackson's sentence in part and remand the case to the trial court to correct a sentencing error.

1. Jackson contends that the evidence was constitutionally insufficient to prove beyond a reasonable doubt that he was a party to the crimes he claims were committed solely by his co-defendant, Cordairus Dorsey. He also argues that the jury's verdict is contrary to the weight of the evidence as well as the principles of justice and equity. He insists that he was merely present when Dorsey assaulted, robbed, and killed Jalloh. For the following reasons, both

denied Jackson's motion for new trial on March 11, 2025. Jackson filed a timely notice of appeal on March 28, 2025,  and the case was docketed in this Court to the August 2025 term and submitted for a decision on the briefs.

2

claims fail.

(a) Jackson was charged individually and as a party to the crimes of murder, armed robbery, aggravated assault, and possession of a firearm during the commission of a felony.

> As a matter of Georgia statutory law, "[e]very person concerned in the commission of a crime is a party thereto and may be charged with and convicted of commission of the crime." OCGA § 16-2-20(a). Conviction as a party to a crime requires proof of a common criminal intent, which a trier of fact may infer from "presence, companionship, and conduct before, during and after the offense." *McGruder v. State*, 303 Ga. 588, 591 (2018) (citation and punctuation omitted). See also *Felts v. State*, 311 Ga. 547, 552 (2021). And "all the participants in a plan to rob are criminally responsible for the act of each committed in the execution of the plan and which may be said to be a probable consequence of the unlawful design," *Williams v. State*, 304 Ga. 658, 662 (2018) (citation and punctuation omitted), a principle we have specifically held applies to murders committed during the commission of "a crime that foreseeably [leads] to murder"—such as armed robbery—perpetrated by a group that shares a common criminal intent. *Felts*, 311 Ga. at 552. See also *Moore v. State*, 311 Ga. 506, 509 (2021).

*Butler v. State*, 313 Ga. 675, 679 (2022) (cleaned up). When we evaluate a "due process challenge to the sufficiency of the evidence, we view the evidence presented at trial in the light most favorable

to the verdicts and ask whether any rational trier of fact could have found the defendant guilty beyond a reasonable doubt of the crimes of which he was convicted." *Shellman v. State*, 318 Ga. 71, 74 (2024) (quotation marks omitted). And "[w]e defer to the jury's resolution of any conflicts in the evidence, the credibility of witnesses, and the drawing of reasonable inferences from the facts." *Hooks v. State*, 318 Ga. 850, 852 (2024). See also *Ridley v. State*, 315 Ga. 452, 455 (2023) ("In [assessing the constitutional sufficiency of the evidence], we do not evaluate witness credibility, resolve inconsistencies in the evidence, or assess the weight of the evidence; these tasks are left to the sole discretion of the jury.").

So viewed, the evidence admitted at trial shows the following. On October 15, 2019, Jackson and Dorsey met at a gas station in DeKalb County and were there together half an hour. After Jalloh drove his car into the station's parking lot and stopped near the door to the station's convenience store, Dorsey robbed and shot Jalloh while Jackson, as the facts recounted below demonstrate, helped Dorsey. The incident was recorded from various angles on the gas

station's surveillance video cameras.

The surveillance videos show Jackson and Dorsey interacting with each other for about 30 minutes prior to the shooting. A witness also recounted seeing Dorsey at the gas station "all day" on the day of the shooting. The video recordings show that, prior to the shooting, the two men walked around together in the parking lot of the gas station. Dorsey wore all black clothing, orange Nike shoes, and a burgundy Polo-branded hat. Dorsey and Jackson spoke with each other, gestured to each other, shook hands, and Jackson tried on Dorsey's burgundy hat. When Jackson entered the convenience store, the surveillance camera recorded clear, color images of his face and clothing.

At about 10:15 p.m., Jalloh drove his car into the gas station parking lot. Dorsey, who was standing outside alone at the time, tapped on the glass window to get Jackson, who was inside, to join him. The video recording shows that Dorsey pulled a handgun from his clothing as he walked to Jalloh's car. As Jalloh opened his car door, Jackson went to the rear of the car and glanced around the

parking lot, as if looking for someone. Dorsey, pointing his gun, stood beside Jalloh's open car door. Upon seeing Dorsey, Jalloh tried to close the car door, but Dorsey pulled it open. As Dorsey struggled with Jalloh, Jackson ran to Dorsey's side. Jackson took a blue bag from Jalloh, and Dorsey shot Jalloh in the chest. Both Jackson and Dorsey left the gas station on foot, with Jackson sprinting away and Dorsey slowly walking away in a different direction, as Jalloh fell from his car onto the pavement. Jalloh died from the gunshot wound to his chest.

Acting on information gathered from eyewitnesses to the shooting as well as anonymous tips, law enforcement officials determined that an individual known as "Polo" or "Juicy Boy" was involved in the shooting. One of the investigators, Detective Brown, was familiar with "Juicy Boy," and knew him as Dorsey. He testified that Dorsey was also referred to as Polo or J. B. Detective Brown identified Dorsey in court as the person he knew as Juicy Boy. He also watched the surveillance video recording as it was played for the jury and identified Dorsey as the person in the burgundy Polo

hat and dark clothing.

The State also introduced in evidence images and video recordings from a Facebook account for a person using the name "Polo Rollack." The account displayed several images of Dorsey. In a video recording posted to the account on October 14, 2019, the day before the shooting, Dorsey can be seen wearing orange shoes like those worn by the shooter. Dorsey's social media accounts contained information that led the police to Jackson's Instagram account. Using data from Jackson's social media, the police were able to obtain Jackson's email address and driver's license information. The police learned that Jackson got a driver's license two days after the shooting. The photograph of Jackson's driver's license showed the same two-toned, "twists" hairstyle worn by the shooter's accomplice in the gas station surveillance video. Images from Jackson's social media page and Jackson's driver's license both show that he had a "21" tattooed on his face.

The police went to Jackson's home where they interviewed his mother. They showed her a still image taken from the surveillance

video, and she positively identified the person in the still image as Jackson. In the still image, Jackson wore a navy-blue Polo shirt and had a two-toned, "twists" hairstyle. The police interviewed Jackson shortly after his arrest. When shown the still image of Dorsey's accomplice from the surveillance video, Jackson identified it as an image of himself.

During a subsequent search of Jackson's home, the police saw a pile of clothing that included a navy-blue shirt like that worn by Jackson and a burgundy Polo hat matching that worn by Dorsey during the shooting. The hat was swabbed for DNA. Subsequent testing showed that the DNA on the hat matched DNA samples taken from both Jackson and Dorsey. The police searched Jalloh's car and found blue bags beneath Jalloh's passenger seat like the one taken by Jackson. The bags contained more than $30,000 in cash.

Jackson argues that this evidence fails to establish that he was a party to the crimes for which he was convicted because he did not shoot Jalloh and was merely present when Dorsey decided to commit the crimes. Jackson is correct that "a person's mere presence at the

scene of the crime and mere approval of the criminal act are insufficient to establish that [he] was a party to the crime," *Grant v. State*, 298 Ga. 835, 837 (2016), but here, there was evidence from which the jury could infer that Jackson was not merely present, but rather an active participant in the crime. Witness testimony and the surveillance video showed that Jackson waited at the gas station with Dorsey, left the convenience store when Dorsey tapped on the glass, and moved to the rear of the car when Dorsey approached Jalloh's car—actions from which a jury could infer that he was acting as a lookout. Then, when Dorsey pointed a gun at Jalloh and then struggled to take Jalloh's property, Jackson went to Dorsey's aid. And when Dorsey shot Jalloh, Jackson took a bag from Jalloh and fled. This evidence authorized a jury to conclude that Jackson was an active participant in the crimes. Thus, it "makes no difference here" that the evidence showed that Dorsey was the one who shot and killed Jalloh; Jackson's "conduct supports the jury's conclusion that he shared an intent" to assault and rob Jalloh at gunpoint. See *Mohamed*, 307 Ga. at 90. Jackson's conduct before,

9

during, and after the crimes supported the jury's conclusion that he shared an intent to commit the aggravated assault and armed robbery of Jalloh. Therefore, the evidence was sufficient for the jury to conclude beyond a reasonable doubt that Jackson was a party to the crimes of felony murder, OCGA § 16-5-1(c), and possession of a firearm during the commission of a felony, OCGA § 16-2-20(b). See *Butler*, 313 Ga. at 679; *Frazier v. State*, 308 Ga. 450, 453–54 (2020).

(b) Jackson contends that the trial court should have granted his motion for new trial on the "general grounds," pursuant to OCGA §§ 5-5-20, 5-5-21, "for the same reasons" he contends the evidence was allegedly insufficient. Jackson argues that the record "does not show that the trial court properly exercised its discretion[.]" We disagree.

Although the evidence was legally sufficient in this case to sustain a conviction as a matter of due process, the trial court had the authority to grant a new trial if it found that the jury's verdict was "contrary to … the principles of justice and equity," OCGA § 5-5-20, or the verdict was "decidedly and strongly against the weight

of the evidence[.]" OCGA § 5-5-21.

> When these so-called "general grounds" are properly raised in a timely motion for new trial, the trial judge must exercise a broad discretion to sit as a "thirteenth juror." … [T]he merits of the trial court's decision on the general grounds are not subject to our review, and the decision to grant a new trial on the general grounds is vested solely in the trial court.

*King v. State,* 316 Ga. 611, 616 (2023) (cleaned up). Here, the trial court, after reviewing the evidence presented at trial, found as follows:

> As a separate inquiry, the Court has also considered its authority under OCGA §[§] 5-5-20 and 5-5-21. The Court has considered the legal sufficiency of the evidence when combined with any conflicts in the evidence, the credibility of witnesses, and the weight of the evidence.
> The Court has also considered the merits of Defendant's arguments. The Court, in an exercise of discretion, finds that the verdict was neither "contrary to evidence and the principles of justice and equity," under OCGA § 5-5-20 nor "decidedly and strongly against the weight of the evidence" under OCGA § 5-5-21.

The record shows that the trial court weighed the evidence and considered the credibility of the witnesses before it determined that Jackson was not entitled to a new trial on the general grounds. Because the trial court's order reflects that it exercised its discretion

11

as the thirteenth juror, this claim presents nothing further for our review. Id. Compare *Holmes v. State*, 306 Ga. 524, 528 (2019) ("[W]hen the record reflects that the trial court reviewed the motion for new trial *only* for legal sufficiency of the evidence, the trial court has failed to exercise" its discretion under the general grounds. (emphasis added)).

2. Jackson contends that the trial court abused its discretion in allowing a State's witness to give his "opinions and comments on a video of the actual murder." Specifically, he argues that the court should not have allowed, over objection, Detective Brown to testify about his identification of Jackson from the gas station surveillance video. He contends that the detective should not have been allowed to testify that the video showed Jackson as he "snatched a bag" from the victim and "fle[d] from the scene."

As a threshold matter, although Jackson claims that he objected to the detective's testimony regarding Jackson's activities on the surveillance video, he identified in his brief an objection only to the admission of screenshots of Jackson's social media. The record

12

reflects that Jackson did not object to the testimony he now complains was improperly admitted. Thus, the claimed error was not preserved for ordinary review, and we review this claim for plain error only. See *Gates v. State*, 298 Ga. 324, 327 (2016); OCGA § 24-1-103(d).

Jackson cannot satisfy the test for establishing plain error because he has not shown the existence of an obvious error.[2] In this case, even if Jackson had objected, the trial court was not required to exclude the detective's statements.

"A witness ordinarily may identify a person in a photo or video

---

[2] To establish plain error, an appellant must meet each prong of a four-prong test:

> [F]irst, there must be an error or defect—some sort of deviation from a legal rule—that has not been intentionally relinquished or abandoned, i.e., affirmatively waived, by the appellant. Second, the legal error must be clear or obvious, rather than subject to reasonable dispute. Third, the error must have affected the appellant's substantial rights, which in the ordinary case means he must demonstrate that it affected the outcome of the trial court proceedings. Fourth and finally, if the above three prongs are satisfied, the appellate court has the discretion to remedy the error—discretion which ought to be exercised if only the error seriously affects the fairness, integrity, or public reputation of judicial proceedings.

*Lewis v. State*, 311 Ga. 650, 664 (2021) (quotation marks and emphasis omitted). As we have noted, affirmatively establishing all four prongs "is a difficult standard to satisfy." Id. at 665 (quotation marks omitted).

if the identification satisfies OCGA § 24-7-701 (a) (Rule 701 (a))." *Lee v. State*, 322 Ga. 44, 59 (2025). Rule 701(a) authorizes the admission of lay witness testimony in the form of opinions or inferences that are rationally based on the witness's perception, helpful to a clear understanding of the determination of a fact in issue, and not based on scientific, technical, or other specialized knowledge. OCGA § 24-7-701(a).[3] The witness may make such an identification if there is "some basis to conclude" that the witness is "more likely to correctly identify" the person in the video than the jury is. *Glenn v. State*, 302 Ga. 276, 279 (2017). When a court is deciding whether "some basis" exists, the court can consider many factors, but the most important is the witness's "level of familiarity" with the person in the video. Id. So if the witness has prior knowledge of the person or has interacted

---

[3] OCGA § 24-7-701(a) provides:
     If the witness is not testifying as an expert, the witness's testimony in the form of opinions or inferences shall be limited to those opinions or inferences which are:
          (1) Rationally based on the perception of the witness;
          (2) Helpful to a clear understanding of the witness's testimony or the determination of a fact in issue; and
          (3) Not based on scientific, technical, or other specialized knowledge within the scope of Code Section 24-7-702.

with him before, as the detective did here with Jackson, that could be a basis to conclude the witness is "better equipped than the jurors" to make a good identification. See id.; *Bullard v. State*, 307 Ga. 482, 493 (2019). In its order denying Jackson's motion for a new trial, the court found that "such was the case here, given the [detective's] familiarity with [Jackson's] appearance due to his investigation of the case."  Based on the record before us, even if Jackson had objected, the trial court would not have abused its discretion in admitting the detective's testimony identifying Jackson on the surveillance video recordings. See id. Therefore, the trial court did not plainly err in allowing the detective's testimony. See *Lewis v. State*, 311 Ga. 650, 665 (2021) (explaining that the appellant cannot prevail if he fails on "even one element of the plain-error test" (citation omitted)).

3. Jackson argues that the "trial court erred in sentencing the Defendant, as mandatory, to life without parole [for] felony murder as the sentence here for felony murder was discretionary and not mandatory."  The record does not support Jackson's contention that

the trial court mistakenly believed it was required to impose a mandatory sentence of life without the possibility of parole.

Because the court sentenced Jackson on the felony murder counts as a recidivist under OCGA § 17-10-7(a)[4], it had the discretion to sentence him either to a life sentence or to a life sentence without the possibility of parole. OCGA § 16-5-1(e)(1) ("A person convicted of the offense of murder shall be punished by death, by imprisonment for life without parole, or by imprisonment for life."). The transcript shows that, at sentencing, the prosecutor asked the court to sentence Jackson to life without parole based on Jackson's "lack of remorse" as well as his conduct during the trial,

---

[4] Code Section § 17-10-7(a) provides:
(a) Except as otherwise provided in subsection (b) or (b.1) of this Code section, any person who, after having been convicted of a felony offense in this state or having been convicted under the laws of any other state or of the United States of a crime which if committed within this state would be a felony and sentenced to confinement in a penal institution, commits a felony punishable by confinement in a penal institution shall be sentenced to undergo the longest period of time prescribed for the punishment of the subsequent offense of which he or she stands convicted, provided that, unless otherwise provided by law, the trial judge may, in his or her discretion, probate or suspend the maximum sentence prescribed for the offense.

which counsel argued showed a disregard for "the seriousness of this entire process." The prosecutor did not state or suggest that such a sentence was mandatory. Following the State's argument, defense counsel made no argument for leniency, asserting that the court was "bound by the recidivist notice." Although the trial court did not expressly state at sentencing that it had exercised its discretion in sentencing Jackson to life without the possibility of parole, it did not state that it believed such a sentence was mandatory. And absent record evidence to the contrary, this Court presumes that "the trial court understood the nature of its discretion and exercised it." *Wilson v. State*, 302 Ga. 106, 108 (citation omitted). Here, the court made its thought process clear at the motion for new trial hearing, vigorously rejecting counsel's assertion that the court imposed the sentence based on defense counsel's mistaken belief that the sentence was mandatory.

> THE COURT: So you're thinking that I didn't exercise my discretion when I gave him –
> TRIAL COUNSEL: It doesn't show it on the record, Your Honor.
> THE COURT: So when I did it, I did it because?

17

TRIAL COUNSEL Because you were told it was mandatory.

THE COURT: You thought I did it because they told me I could? No, not in this building; not in these walls; that's not how it goes.

In its written order denying Jackson's motion for new trial, the trial court stated that it was "fully aware of the difference between section (a) and (c) recidivist sentencing" and that it based its sentence on the State's argument at sentencing as well as the evidence presented at trial, including all the facts and circumstances of the crimes. Further, the trial court explained that "[t]he sentence was entered solely as an act of discretion and not due to any misapprehension of the law." Because the record shows that the trial court exercised its discretion when entering the sentence, the trial court did not err in sentencing Jackson to life without the possibility of parole. See *Williams v. State*, 316 Ga. 147, 152–53 (2023); *Dozier v. State*, 306 Ga. 29, 31–32 (2019).

4. Jackson asserts that he was denied constitutionally effective assistance of counsel when his attorney did not object to the State's recommended sentence of life without the possibility of parole for

felony murder and agreed that the court "must sentence" accordingly.

To prevail on a claim of ineffective assistance of counsel, a defendant must show that his counsel's performance was deficient and that the deficient performance prejudiced him. *Strickland v. Washington,* 466 US 668, 687 (1984). To satisfy the deficiency prong of the *Strickland* test, a defendant must demonstrate that trial counsel "performed at trial in an objectively unreasonable way considering all the circumstances and in the light of prevailing professional norms." *Butler v. State*, 313 Ga. 675, 683 (2022) (quotation marks omitted). To satisfy the prejudice prong of the *Strickland* test, a defendant must demonstrate "a reasonable probability that, but for counsel's deficiency, the result of the trial would have been different." *Burke v. State*, 320 Ga. 706, 708 (2025) (quotation marks omitted). And, if a defendant fails to make a sufficient showing on one prong of the *Strickland* test, we need not address the other prong. *Starks v. State*, 320 Ga. 300, 304 (2024).

Assuming, without deciding, that counsel was deficient for

mistakenly believing that the trial court was required to sentence Jackson to life without the possibility of parole for felony murder, Jackson has not shown that, had he objected to the sentence and argued for leniency, there is a reasonable probability that the outcome would have been different. In its order denying the motion for new trial, the trial court expressly stated that it intended to impose the sentence it did based on the State's arguments and Jackson's apparent lack of remorse. Because Jackson failed to satisfy the prejudice prong of the *Strickland* standard, Jackson failed to meet his burden of establishing ineffective assistance of counsel. See *Starks,* 320 Ga. at 304. Consequently, this claim of error fails.

5. Although the trial court did not abuse its discretion in sentencing Jackson to life in prison without the possibility of parole for felony murder, see Division 3, supra, it did err in imposing that sentence on both counts of felony murder. "When a defendant is found guilty on multiple counts of murder for a single homicide, all additional counts beyond one for which the defendant is sentenced

are surplusage and must be vacated." *Walton v. State*, 303 Ga. 11, 17 (2018). Under the circumstances here, Jackson's sentences for felony murder and the sentences for predicate felonies underlying the felony murder counts must be vacated and the case remanded for resentencing, so that the trial court may properly sentence Jackson "for felony murder on a single count and to reconsider sentencing in light of the remaining predicate offense for the surplus count of felony murder which must be vacated by operation of law." Id. Because the court erroneously sentenced Jackson on both felony murder convictions instead of vacating one of them, it did not consider whether the surplus predicate felony merges as a matter of fact into the single felony murder conviction remaining. It may do so on remand.[5] See, e.g., *Noel v. State*, 297 Ga. 698, 700 (2015) ("[O]n resentencing, a legal conviction may be entered on only one felony murder verdict, the underlying felony charged in that count will

---

[5] We note that, because the court ran Jackson's sentence for his firearm conviction consecutive to the felony murder sentences that have been vacated, the trial court must also resentence Jackson on his firearm possession conviction.

21

merge into the felony murder conviction as a matter of law, the remaining felony murder verdicts will stand vacated by operation of law, and a determination whether the remaining non-murder felonies merge as a matter of fact into the felony murder conviction will need to be made."); *Cowart v. State*, 294 Ga. 333, 336 (2) (2013) (holding that the decision regarding which felony murder verdicts shall be deemed vacated, which may affect other sentencing decisions, is left to the discretion of the trial court on remand).

*Judgment affirmed; sentence vacated in part and case remanded for resentencing. All the Justices concur.*